AB:JV
F# 2018R02044

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE PREMISES KNOWN AND DESCRIBED AS 82-51 234th STREET, QUEENS, NY 11427 | **TO BE FILED UNDER SEAL**<br><br>APPLICATION FOR A SEARCH WARRANT FOR A PREMISES AND CLOSED OR LOCKED CONTAINERS, COMPARTMENTS AND ELECTRONIC DEVICES FOUND THEREIN<br><br>Case No. 19-M-865 |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, ANTHONY P. RUFFINI, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search: the premises known as 82-51 234th Street, Queens, NY 11427, including a freestanding garage at that address, and any closed or locked containers, compartments and electronic devices contained therein (the "TARGET PREMISES") as described in Attachment A(I), for the things described in Attachment A(II).

2.      I am a Special Agent with the Food and Drug Administration's Office of Criminal Investigations ("FDA") and have been since April 2018.   Prior to that, I was a Special Agent with the United States Department of Agriculture, Office of Inspector General, from February 2015 through 2018.   During my time as a federal law enforcement officer, I have personally participated in numerous investigations and arrests, the debriefing of

witnesses and the execution of numerous search warrants related to various types of criminal activity including, among others, mail fraud and violations of the Food, Drug and Cosmetic Act ("FDCA"), including the execution of search warrants for electronic devices, including cellular telephones and internet-capable devices contained therein. I am familiar with the facts and circumstances set forth below from: (a) my participation in the investigation; (b) my review of the investigative file and reports of other law enforcement officers involved in the investigation; and (c) my review of bank records, telephone records, social media accounts and other sources of information.

3.    Upon information and belief, there is probable cause to believe that there is kept and concealed within the TARGET PREMISES items that constitute evidence, fruits and/or instrumentalities of violations of 18 U.S.C. §§ 371 (Conspiracy), 402 (Contempt), 542 (Entry of Goods by False Statement), 545 (Smuggling), 554 (Smuggling Goods From the United States, 1001 (False Statements or Entries Generally),   1341 (Mail Fraud), 1343 (Wire Fraud) and 1349 (Attempt and Conspiracy), and 21 U.S.C. §§ 331 (Food Drug and Cosmetic Act Prohibited Acts), 352 (Misbranded Drugs), and 355 (New Drugs) (collectively, the "SUBJECT OFFENSES").

4.    Unless specifically indicated, all conversations and statements described in this affidavit are related in sum and substance and in part only.   This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## THE TARGET PREMISES

5.      The TARGET PREMISES is 82-51 234th Street, Queens, NY 11427, a white one-story single-family residence with dark-colored awnings, including a freestanding one-car garage located to the rear of the residence, and any closed and locked compartments and containers, cellular telephones and internet-capable devices contained therein.    A photograph of the TARGET PREMISES is shown below:



The numerical address ("82-51") of the TARGET PREMISES is located on the right-hand side of the front door of the single-family residence.

6.      Public records checks show that the TARGET PREMISES is owned by the Barbara Vale Revocable Trust.    BARBARA VALE and her son, JASON VALE (collectively, the "VALES"), together with others, are the targets of violations of the SUBJECT OFFENSES.    Based on surveillance, BARBARA VALE is believed to occupy the

TARGET PREMISES alone. Based on my review of public records, I have learned that utilities of the TARGET PREMISES are in BARBARA VALE's name.

7.    JASON VALE is believed to occupy 82-50 235th Street, Queens, New York 11427 – the residence whose backyard abuts the backyard of the TARGET PREMISES. For the reasons detailed below, there is probable cause to believe that the TARGET PREMISES, including the electronic devices contained therein, contains evidence, fruits and instrumentalities of the SUBJECT OFFENSES.

## **PROBABLE CAUSE**

A.    Background Regarding Sale of Laetrile and Similar Products

8.    Based on my investigation, I know that there is an active market for products that have not been approved by the U.S. Food and Drug Administration ("FDA"), but that sellers nonetheless market as being able to treat and cure diseases, including cancer. One of these products is amygdalin. Amygdalin is a glucoside found in the kernel or seeds of most fruits and is frequently referred to as "Laetrile" or "Vitamin B-17." While some people believe that Laetrile can treat and control cancer, the FDA does not support this claim. Additionally, there are no published clinical studies supporting the claim that Laetrile is safe or effective. Thus FDA does not support the use of Laetrile for the treatment of cancer. Moreover, the medical community has found that cancer patients who nonetheless utilize Laetrile often forgo conventional therapies to their detriment, thus presenting a health risk. It is a violation of the Food Drug and Cosmetic Act to promote unapproved and misbranded drugs as a cure for any disease, including cancer.

B.      Legal Proceedings

        9.      In 1999, the government filed a civil action in the Eastern District of New

York against JASON VALE, an individual, and his company Christian Brothers Contracting

Corporation, a corporation, alleging that they were distributing Laetrile as a cure for cancer and

seeking, inter alia, that they be permanent enjoined from selling or promoting Laetrile as a cure

for cancer in the future (the "Civil Action").   (No. 99 CV 7683.)

        10.     On April 20, 2000, Vale, Christian Bros. and their attorneys appeared at

the hearing on the government's motion for a preliminary injunction.   At that time they offered

no evidence or legal arguments to suggest that the government was not entitled to a preliminary

injunction; to the contrary, they consented to the issuance of a preliminary injunction.

        11.     On November 17, 2000, the Honorable John Gleeson approved a Consent

Decree of Permanent Injunction (the "INJUNCTION") permanently restraining and enjoining

JASON VALE, Christian Bros. Contracting Corp. "and each and all of their agents,

representatives, employees, successors and assigns, and any and all persons in active concert or

participation with any of them" from *inter alia*:

>               Introducing or delivering for introduction into interstate commerce,
>               holding or sale after shipment in interstate commerce, manufacturing,
>               processing, packing, labeling, promoting in violation of the FDC Act, or
>               distributing amygdalin, laetrile, "Vitamin B-17", apricot seeds, any
>               similar product containing or purporting to contain amygdalin, laetrile,
>               "Vitamin B-17", or apricot seeds, or any drug product that is a new drug
>               as defined in 21 USC 321 (p)...."

12.     Despite entering into the INJUNCTION, JASON VALE and Christian Bros. Contracting Corp. continued to sell amygdalin, laetrile, Vitamin B-17, apricot seeds and similar products (the "Enjoined Substances") in violation of the INJUNCTION.

13.     On April 16, 2002, based upon the affidavit of a special agent of the FDA, the district court initiated a criminal contempt prosecution against JASON VALE by issuing an order to show cause.  The order to show cause charged JASON VALE with four counts of criminal contempt in violation of 18 U.S.C. § 401(3): (1) that, with the intent to deceive the FDA, the district court and his customers, JASON VALE labeled, packed and distributed laetrile in violation of the preliminary injunction in the Civil Action; (2) that, with the intent to deceive the FDA, the district court and his customers, JASON VALE labeled, packed and distributed laetrile in violation of the permanent injunction in the Civil Action (Count Two); (3) that JASON VALE promoted laetrile as a cure for cancer over the Internet in violation of the preliminary injunction in the Civil Action (Count Three); and (4) that JASON VALE promoted laetrile in violation of the FDCA as a cure for cancer over the Internet in violation of the permanent injunction in the Civil Action (Count Four).

14.     On July 21, 2003, JASON VALE was convicted after a trial before Judge Gleeson of Counts 1-3 of criminal contempt, which stemmed from his violations of the express terms of the INJUNCTION issued by Judge Gleeson.[1]  (No. 02 CR 466, ECF No. 83.) Thereafter, Judge Gleeson sentenced JASON VALE to 63 months' incarceration.  (ECF No.

---

[1] The United States voluntarily dismissed Count 4 on July 16, 2019, during the trial.

128.)   In 2005, the Second Circuit affirmed Jason Vale's convictions.   United States v. Vale,

140 F. App'x. 302 (2d. Cir. 2005).

      15.    On February 2, 2005, in response to a pro se motion for "clarification" of

the INJUNCTION filed by JASON VALE, Judge Gleeson observed:

> I find the application troubling.   First, Vale has demonstrated great
> familiarity (but not great compliance) with the statutes and regulations
> at issue in this case.   He can read the relevant provisions of the FDC Act
> himself for a reminder of the conduct he agreed would be prohibited by
> the consent decree.       Second, given the extensive, lucrative and
> fraudulent conduct that gave rise to Vale's contempt conviction, the last
> endeavor he should be planning is the promotion of laetrile products in
> any way.

(No. 99 CV 7683, ECF No. 40.)

Judge Gleeson ultimately denied the motion and did not issue any clarification of the

INJUNCTION.

C.    Use of WEBSITE to Sell Laetrile

      16.    Since at least January 2013, until the present (the "RELEVANT TIME

PERIOD"), the VALES have been operating an online business through a website called

"Apricotsfromgod.info" (the "WEBSITE"), from which consumers may purchase various

products including Enjoined Substances.   The VALES also operate other websites which

automatically redirect visitors to the WEBSITE.

      17.    As recently as June 10, 2019, statements on the WEBSITE provide in

relevant part:

> The Answer to Cancer is known! Just a few seeds per day. Edgar Cayce
> claimed over 40 years ago that just 2 bitter almonds a day and one would
> never see cancer in their lifetime.... Each one of the above diseases killed
> many, millions in some cases and took decades upon decades before it
> just became common knowledge as to the cures. In no case did Big
> Pharma make an announcement as to these cures until, like I said, it just

became common knowledge. Bitter almonds are no longer available in the U.S. Apricot seeds contain the same vitamin nutrient sometimes called vitamin B17, nitrilosides or amydgalin. At one time Laetrile was the commercial name for these nitrilosides.

\* \* \* \* \*

THE SEED. Tens of thousands know the answer to cancer, and do not fear the disease, myself included.

\* \* \* \* \*

A while ago, a man from my church, Bill DePap, gave me a video tape called 'World Without Cancer', by G. Edward Griffin. It told the truth of a vitamin that contains cyanide and that it's found in seeds, certain grains, grasses and minutely in beans and meats . . For six years I've been researching the information contained in the tape as well as using it to treat my kidney cancer. It's all true. ... .

\* \* \* \* \*

Below are news reports of some studies showing that Cyanide kills cancer. (The apricot seeds have Cyanide in them but even the good guys have to make money so they can't tell you to just eat apricot seeds and some of the other 1200 food with cyanide in them.)

18.     The website also contains an excerpt from a speech given by Ernest

Krebs, Jr. regarding the use of B17 in treating cancer. It states in relevant part:

It is certainly a pleasure to be here at the Second Annual Convention of the Cancer Control Society-an outgrowth, as you know, of the International Association of Cancer Victims and Friends. As I look back through the years marketing the emergence of these two fine Societies, I can recall the number of miraculous victories we have had in those intervening years; that it is as true today as it was eleven years ago that Laetrile, Vitamin B17, is the first and last final hope in the prophylasis in therapy of cancer in man and animals. The reason for this is that Laetrile is a vitamin. It is the 17th of the B vitamins.

We hear a great deal about its use in terminal cancer, but the time to start with vitamin B17 is now before the disease become [sic] clinical. ....

19.     Additionally, under the "Cancer" section of the WEBSITE, there is information regarding the history of natural foods that purportedly proves that they are capable of treating certain diseases.  In this section, the WEBSITE advocates that Vitamin B17 is an effective treatment for cancer.  It states in relevant part: "Nothing has come about to do anything except to make more obvious the fact that Laetrile, Vitamin B17 is the answer to cancer."

20.     On October 18, 2019, I again visited the WEBSITE and confirmed that it is still operational, and continues to tout the health benefits of the Enjoined Substances as well as offer them for sale.   These statements include:

> THE ANSWER TO CANCER IS KNOWN
>
> If I sell orange juice for cancer, I am now selling a drug as defined under 21 U.S.C. 352. The law has been formed over years and years of court cases, each one adding to the lock that doctors have over treating disease. There is a list of "diseases" that only doctors are allowed to treat. This list includes CANCER, ARTHRITIS, DIABETES, HEART DISEASE, and hundreds of other "names" of ailments which the establishment has secured patents on. They own the words of all the diseases and the words TREAT, CURE, MITIGATE etc. If I sell you string beans for you diabetes, I am now selling an illegal unapproved drug. No matter how many people we CURED with apricot seeds, the vitamin B-17 that is found in them and some other aids, it does not matter. As a matter of fact, we have had over a 90 percent success rate with the apricot seeds and other aids, but our records do not matter.

D.     Undercover Purchases From The WEBSITE

21.     In 2018 and 2019, the Food and Drug Administration ("FDA") effected several undercover purchases through the WEBSITE.   The financial aspect of the WEBSITE transactions were conducted through an account operated by Paypal, Inc.  (the "PAYPAL ACCOUNT").   Paypal, Inc. records indicate that Barbara Vale is the registered owner of the PAYPAL ACCOUNT.   Further, the PAYPAL ACCOUNT is associated with email address "babsie214@aol.com" (the "BARBARA VALE EMAIL ACCOUNT").   A search warrant of

the BARBARA VALE EMAIL ACCOUNT was authorized by the Honorable Steven M. Gold on May 2, 2019. See 19-M-415. An execution of that search warrant revealed that the subscriber of the BARBARA VALE EMAIL ACCOUNT was "Barbara Vale."

22. Transaction logs from Paypal, Inc. contain information such as "Item ID" and "Item Title." Paypal transaction logs for the PAYPAL ACCOUNT from January 2013 to September 22, 2019 indicate that the majority of sales made through that account are for the Enjoined Substances, including apricot seeds (e.g., "Apricot Seeds 1 Pound," "Vitamin B17, 500 mg Capsules," "DMSO 8oz. bottle," "SuperZyme").

23. Based on a review of records received from Paypal Inc., payments made to the VALE PAYPAL ACCOUNT for the purchase of Enjoined Substances, from January 2013 through September 22, 2019, have totaled more than $850,000.

24. On March 1, 2019, the FDA placed an undercover buy through the WEBSITE for "3lbs Apricot Seeds/3 bottles Vit B-17 (500mg) 100 ea. & DVD" (the "ORDER"). The ORDER total was $259.00 plus $27.75 in shipping costs. The ORDER was shipped through the United States Postal Service ("USPS") with a Click-N-Ship[2] label linked to a specific Click-N-Ship account number (the "Click-N-Ship Account"). The entity associated with the Click-N-Ship Account is "Christian Brothers," the email address associated with the Click-N-Ship Account is the VALE EMAIL ACCOUNT and the physical address associated with the Click-N-Ship Account is the TARGET PREMISES. The email confirmation for the ORDER was sent from Paypal, Inc. and indicated that the $286.75 payment

---

[2] Click-N-Ship is a service by USPS that allows customers to print out their own postage and labels, with USPS bar codes, and schedule USPS pickups.

was sent to the merchant "health clearing house (babsie214@aol.com);" i.e., the BARBARA VALE EMAIL ACCOUNT.

E.    Execution of the BARBARA VALE EMAIL ACCOUNT Search Warrant

        25.    Execution of the search warrant for the BARBARA VALE EMAIL ACCOUNT provided additional evidence that the VALES are continuing to sell the Enjoined Substances in violation of, among other things, the INJUNCTION.    For example, on or about January 8, 2016, at approximately 2:55 p.m., BARBARA VALE, using the BARBARA VALE EMAIL ACCOUNT, wrote another individual that

> Jason is doing great .. still armwrestling and keeping his business going. When one of his suppliers of B-17 (our second best seller) cut us off because we undercut their price, Jason sad [sic] "you're going to be sorry, I'm going to take over the country now" and so he made connections in China, shipped in 30K of b-17 powder, found a bottling company in California, and here we go … took away 50% of that other company's business.
>
> …
>
> I am too busy .. do 3 or 4 hours of work for Jason every day.

        26.    On or about April 28, 2016, at 4:10 a.m., the BARBARA VALE EMAIL ACCOUNT received an email from a customer ("Customer-1") of "Vitamin B17 powder" and apricot seeds containing the following message:

> Hi Barbara,
> I read read [sic] some of the testimonials on the apricotsfromgod website and saw that the person who's addressed there is "Jason".    If you can't help me maybe could you please forward this email to him.
> Yesterday I suffered severe poisoning. I only had one scoop of your b17 powder in the morning with food and then for lunch I had home made cottage cheese with 2 table spoons of flax seed oil.
> Within 10 mins of eating the cheese and flax seed oil I felt terribly sick, vertigoes [sic], chills, thought I was going to pass out and then vomited everything. I was very sick the whole day and today I still feel part of the "poison" in my body.

> I did a lot of research and apparently the "poisonous" cyanide molecule, or whatever it is exactly, is also present in flax seed oil and even in cow milk. So it would appear that the association of the three was like a bomb. But even in the previous days I felt very nauseous and was knocked out for a few hours, so much so I had to go to bed. I took only one scoop of b17 powder (too much?) My mum and a friend also felt their thinking went blurred after eating the apricot kernels.
> I understand you're not health practitioners, but you've been doing this long enough to know of other people who may have had the same symptoms and how they dealt with them.
> Of course on the internet there are many articles stating amygdalin as a cancer cure is quackery and that it can even be lethal. I have just bought 10 bottles because I believe in this natural remedy and have read so many testimonials, but I'm a bit concerned now. ...

The BARBARA VALE EMAIL ACCOUNT did not reply to Customer-1 but, instead, forwarded the email to "jasonvale@yahoo.com."

27. On or about November 28, 2016, the BARBARA VALE EMAIL ACCOUNT emailed a customer located abroad and wrote "I will try to be creative in describing my next shipment (bagels maybe:) I send quite a few orders to the Netherlands and I usually say supplements and give a value of $10 and I never insure. I haven't had any complaints yet." On December 3, 2016, the BARBARA VALE EMAIL ACCOUNT emailed the same customer and wrote "I got your order out today .. I didn't put an invoice in it ... its marked jellybeans.. They are $50 each plus $21 shipping... I hope it goes through customs ok...:) Love ya."

28. On January 29, 2019, the FDA issued a Notice of FDA Action, notifying the VALES that the FDA had detained a shipment of Apricot Kernel Extract because it "appears to be a new drug without an approved new drug application." On February 2, 2019, JASON VALE emailed the Chinese manufacturer of the Apricot Kernel Extract, writing:

> "I am very upset that you asked us to order from your company and you do not know how to ship to the United States the proper way. Also I do not understand how you can be afraid of customs. The worst that can happen is that the package gets shipped back to you. This is not an illegal product. You

> cannot use DHL anymore you must use FedEx or a Nother [sic] way.   And you
> must deal with customs the minute that they contact you.   ... Jason Vale
> www.apricotsfromgod.com
> Jason Vale."

29.     On February 13, 2019, the Chinese manufacturer emailed JASON

VALE asking about FDA procedures, and asked, if they resent the Apricot Kernel Extract,

"can we use the substitute name such as yam extract or other name instead of Apricot kernel

extract?"   JASON VALE replied:

> "This is Jason ... Yes you can call it yam extract, baby powder, anything you
> like. Just email us the proper c of a and documentation. Don't use dhl please.
> Fed ex has never given us this problem and also don't put 7500 because the tax
> is much too high. We also have paid a duty tax of 700 on the last shipment with
> no product. Please send product and when the other batch is released we will
> immediately wire you the money for the second one. As of now the fda is
> claiming the last batch has fallen under 'New and unapproved drug. I will email
> you the letter that has been sent to us which the FDA says they are withholding
> the product."

30.     Based on my review of emails, it appears that the VALES, and their

employee MADELINE BECKA, communicated with the FDA about the detained shipment.

On February 27, 2019, the FDA emailed MADELINE BECKA and JASON VALE, stating

that "You need to address the concerns with importing apricot kernels indicated in the link"

and providing a link to an FDA website.   In pertinent part, the FDA website states that

"Laetrile and amygdalin products are generally not amenable to importation under the

personal importation of drugs policy outlined in RPM Chapter 9, Subchapter 9-2 Coverage of

Personal Import Importations."

31.     A March 2, 2019 emails further states that:

> "I just spoke with [an FDA Compliance Officer] and she said that since she just
> received the email from Maddie claiming the apricot seed extract is going into a
> body scrub she will release it today. The law only says it can't be imported
> from a doctor affidavit to be used with patients.
> All is good.

www.apricotsfromgod.com
Jason Vale"

Based on my investigation and review of records, the VALES and their companies have never manufactured or sold any body scrub.

32.    Emails received from the BARBARA VALE EMAIL ACCOUNT as recently as May 2019, indicate that the business of selling the Enjoined Substances is ongoing. For example, an email dated May 1, 2019, from the BARBARA VALE EMAIL ACCOUNT to a customer ("Customer-2") states, "We received your return today," including of apricot powder and B-17 capsules.   The email represents that it will "credit [Customer-2] in the same manner it was charged," and "encourage[d] [Customer-2] to continue chewing the apricot seeds" as "[w]e have so many testimonies as to their effectiveness."

F.    Surveillance of the TARGET PREMISES

33.    In or around April 2019, inspectors with the United States Postal Service ("USPS") placed a motion-sensor pole camera on a tree in front of the TARGET PREMISES (the "Camera").

34.    On or about April 20, 2019, surveillance from the Camera recorded JASON VALE entering the TARGET PREMISES at approximately 10:51 a.m.   At 11:07 a.m., JASON VALE existed the TARGET PREMISES and placed packages inside a USPS bin outside of the front door of the TARGET PREMISES for pick up by the USPS.

35.    On or about May 7, 2019, physical surveillance depicted BARBARA VALE exiting the TARGET PREMISES at approximately 11:00 a.m.   She placed several packages inside two USPS bins outside of the front door of the TARGET PREMISES for pick up by the USPS (the "SUBJECT PACKAGES").   Multiple of the SUBJECT PACKAGES bore the return address, "CHRISTIAN BROTHERS, 8251 234TH STREET, BELLRS MANOR NY

11427," i.e., the address of the TARGET PREMISES, and contained labels with the same Click-N-Ship account number as that used in the ORDER.

36.     The United States Postal Service mail carrier for the TARGET PREMISES states that BARBARA VALE typically sends out two to three postal tubs full of padded envelopes daily, that he picks up from the TARGET PREMISES. He further stated that this volume has been consistent for the two to three years that he has serviced the TARGET PREMISES.

37.     On July 9, 2019, JASON VALE was observed exiting the open detached garage of the TARGET PREMISES. Also on that date, through the open garage door, a pallet of large cardboard boxes wrapped in plastic shipping tape was visible. Based on my experience and investigation, it is likely that the pallet contained Enjoined Substances received from the VALES' bottler, and that the VALES are storing Enjoined Substances in the garage prior to shipping to customers.

## **COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS**

38.     As described above and in Attachment A(II), this application seeks permission to search for records that might be found on the TARGET PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

39.     *Probable cause.* I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special

software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e. Based on actual inspection of other evidence related to this investigation, including electronic mail, the WEBSITE, invoices, and home-generated "Click-N-Ship" postage and mailing labels, I am aware that computer equipment was used to generate and transmit documents used in the VALEs' business importing and selling Laetrile and similar products. There is reason to believe that there is a computer system currently located on the TARGET PREMISES.

40. *Forensic evidence.* As further described in Attachment A(II), this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the TARGET PREMISES because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information

on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers

typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.   Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.   For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.   Such file data typically also contains information indicating when the file or image was created.   The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).   The geographic and timeline information described herein may either inculpate or exculpate the computer user.   Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.   For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

    c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

    d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.   While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.   Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.   For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

    41.    *Necessity of seizing or copying entire computers or storage media.*   In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant.   In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.   Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors

and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

    a.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

    b.  Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

42. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

43. I submit that this affidavit supports probable cause for a warrant to search the TARGET PREMISES described in Attachment A(I), including any closed containers, locked compartments and electronic devices found therein, and seize the items described in Attachment A(II).

## REQUEST FOR SEALING

44. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that online criminals actively search

for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

ANTHONY P. RUFFINI
Special Agent
Food & Drug Administration
Office of Criminal Investigations

Subscribed and sworn to before me on October 22, 2019

Honorable Sanket J. Bulsara
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### I.   Premises to be Searched—Target Premises

The premises to be searched (the "Target Premises") are described as follows, and include any closed or locked containers, compartments and electronic devices (including computers, cellular telephones and internet-capable devices) and storage media found therein:

the white one-story single-family residence with dark-colored awnings, including a freestanding one-car garage to the left and rear of the residence, located at 82-51 234th Street, Queens, NY 11427 and with the numerical address "82-51" appearing to the right of the front door, as shown in the photograph below:



### II.   Items to Be Seized

#### A.   Evidence, Fruits, and Instrumentalities of the Subject Offense

The items to be seized from the Target Premises include the following evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 371 (Conspiracy), 402 (Contempt), 542 (Entry of Goods by False Statement), 545 (Smuggling), 554 (Smuggling Goods From the United States), 1001 (False Statements or Entries Generally),   1341 (Mail Fraud), 1343 (Wire Fraud) and 1349 (Attempt and Conspiracy), and Title 21, United States Code Sections 331 (Food Drug and Cosmetic Act Prohibited Acts), 352 (Misbranded Drugs), and 355 (New Drugs) ("Subject Offenses") from 2013 to the present, described as follows:

a.      Evidence of the ownership, control and use of the Target Premises, including bills, mail envelopes, addressed correspondence, bank statements and identification documents.

b.      Evidence concerning introducing – or delivering for introduction – into interstate commerce, holding for sale after shipment in interstate commerce, manufacturing, processing, packing, labeling, promoting in violation of the Federal Food, Drug, and Cosmetic Act (FDC Act), 21 U.S.C. §§ 301-97, or distributing amygdalin, laetrile, "Vitamin B-17," apricot seeds, any similar product containing or purporting to contain amygdalin, laetrile, "Vitamin B-17," of apricot seeds, or any drug product that is a new drug, as defined in 21 U.S.C. § 321(p) (the "Enjoined Substances"), and as enjoined by the Court's 2000 Consent Decree of Permanent Injunction, including but not limited to:

- Enjoined Substances;
- correspondence concerning the purchase, shipping, testing, labeling, packaging, transport and sale of Enjoined Substances;
- labeling and packaging materials for Enjoined Substances;
- books, records, receipts, notes, ledgers and other papers relating to Enjoined Substances.

c.      Evidence concerning introducing – or delivering for introduction – into interstate commerce any drug that is misbranded within the meaning of 21 U.S.C. §§ 352(c), 352(f)(1), or 353(b)(1).

d.      Evidence concerning causing the misbranding, within the meaning of 21 U.S.C. §§ 352(c), 352(f)(1), or 353(b)(1), of any drug while held for sale after shipment in interstate commerce.

e.      Address and/or telephone books, rolodex indices and any records (paper or electronic) reflecting names, addresses, telephone numbers, and email addresses, and insurance information of customers who purchased or were shipped Enjoined Substances.

f.      Contact information and communications with co-conspirators including telephone logs, text messages, messages sent through encrypted applications, emails, and hand written notes.

g.      United States or foreign currency, money wrappers, checks, jewelry, precious metals, and other valuables used to purchase Enjoined Substances, or which represent the proceeds of the Subject Offenses.

h.      Passwords and keys necessary to obtain access to closed or locked containers, compartments or electronic devices.

## B.     Search and Seizure of Electronically Stored Information

The items to be seized from the Target Premises also include any electronic devices (including computers, cellular telephones and internet-capable devices) and storage media that may contain any electronically stored information falling within the categories set forth in Section II.A of this Attachment above, including, but not limited to, desktop and laptop computers, disk drives, modems, thumb drives, personal digital assistants, smart phones, digital cameras, and scanners. In lieu of seizing any such electronic devices or storage media, this warrant also authorizes the copying of such devices or media for later review.

The items to be seized from the Target Premises also include:

1. Any items or records needed to access the data stored on any seized or copied computer devices or storage media, including but not limited to any physical keys, encryption devices, or records of login credentials, passwords, private encryption keys, or similar information.

2. Any items or records that may facilitate a forensic examination of the computer devices or storage media, including any hardware or software manuals or other information concerning the configuration of the seized or copied computer devices or storage media.

3. Any evidence concerning the identities or locations of those persons with access to, control over, or ownership of the seized or copied computer devices or storage media.

## C.     Review of ESI

Following seizure of any electronic devices and storage media and/or the creation of forensic image copies, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained therein for information responsive to the warrant.

In conducting this review, law enforcement personnel may use various techniques to locate information responsive to the warrant, including, for example:

- surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

- scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

- performing key word searches through all electronic storage areas to determine

whether occurrences of language contained in such storage areas exist that are
intimately related to the subject matter of the investigation; and

• reviewing metadata, system information, configuration files, registry data, and
any other information reflecting how, when, and by whom the computer was
used.

Law enforcement personnel will make reasonable efforts to search only for files,
documents, or other electronically stored information within the categories identified in
Sections II.A and II.B of this Attachment.   However, law enforcement personnel are
authorized to conduct a complete review of all the ESI from seized devices or storage media if
necessary to evaluate its contents and to locate all data responsive to the warrant.